# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE-OPELOUSAS  DIVISION

| | |
|---|---|
| Harold Schoeffler and Louisiana Crawfish Producers Association-West | Civil Action No. 05-1573 |
| | Judge Tucker L. Melançon |
| versus | |
| Dirk Kempthorne, United States Secretary of the Interior | Magistrate Judge Mildred E. Methvin |

## MEMORANDUM RULING

*The dignity and stability of government in all its branches, the morals of the people, and every blessing of society depend so much upon an upright and skillful administration of justice, that the judicial power ought to be distinct from both the legislative and executive, and independent upon both, that so it may be a check upon both, and both should be checks upon that.*
*- John Adams, "Thoughts on Government," Papers 4:86-93, April 1776*

_____ There can be no law, much less "the rule of law," if the administrative agencies that have been entrusted to implement the law as enacted by Congress can fail to fulfill their statutory duty without consequence.  Article III courts are charged with the constitutional duty of protecting and ensuring the rule of law.  On occasion, as under the statute at issue in this case, Congress has provided citizens a direct means of redress to force a government agency to comply with its statutory duty and to implement that law.

If this Court were to accept the position espoused by the United States Department of Interior in this proceeding, based on the uncontested facts in the record before the Court, there would be no law.  The crux of the Secretary's position is: *we did not do our*

-1-

*job; we did not follow the law; but . . . too bad, plaintiffs did not file suit in time . . . this,*

*despite our misrepresentations to plaintiffs and to the public to the contrary.*

## I. THE ENDANGERED SPECIES ACT

*"The nation behaves well if it treats the natural resources as assets which it must turn over to the next generation increased, and not impaired, in value."  Theodore Roosevelt, 26th President of the United States and inspiration for the teddy bear,"*The New Nationalism*" (1910),* NWTR, *XVII, p. 52.[1]*

In 1973, Congress enacted the Endangered Species Act (ESA), 16 U.S.C. § 1531, *et seq.*, "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).  Recognizing that habitat is key to a species' survival, the statutory scheme mandates the establishment of important procedural and substantive protection for contemplated animals and the ecosystems or habitats upon which a species depends.[2]

Procedurally, section 4 of the ESA first requires the Secretary of the Interior (the

---

[1]   History tells that in November 1902, President Theodore Roosevelt and some of his friends traveled to Mississippi on a hunting trip. Roosevelt's tracker, noted African-American hunter and sportsman Holt Collier, an ex-slave and Confederate soldier, found and caught a black bear. Roosevelt famously declined to shoot the black bear that had been brought to bay by others, calling it "unsportsmanlike." News reporters throughout the country spread the story of Roosevelt's kind act, and famed cartoonist Clifford Berryman drew a cartoon depicting Roosevelt 's rescue of the bear.  As legend would have it, a store owner in Brooklyn saw the cartoon and decided to make toy bears to sell in his shop. He asked President Roosevelt for permission to use the name "Teddy's Bear" for his toys as a reminder of the bear Roosevelt had set free.  *See* Auchincloss, Louis, Ed. Theodore Roosevelt, The Rough Riders and an Autobiography (Library of America, 2004).

[2]   The designation of critical habitat provides substantial protection by requiring that all federal agencies must consult with the Secretary to "insure that any action authorized, funded or carried out by [federal agencies] is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of [its critical habitat]." 16 U.S.C. § 1536(a)(2).

Secretary) to make status determinations about a species, including whether the species

qualifies as "endangered" or "threatened."[3] 16 U.S.C. § 1533 *et seq*.  The ESA further

requires that, upon officially listing a species as "endangered" or "threatened," the

Secretary shall concurrently make a determination regarding the species' "critical

habitat," and publish the regulation listing the habitat in the Federal Register.[4] 16 U.S.C. §

1533(a)(3).

The Secretary's duty to designate the critical habitat concurrent with the listing of

the species has two limited exceptions: (1) where it would not be "prudent" to designate

critical habitat;[5] or (2) where the boundaries of the habitat are "not determinable."[6] 16

U.S.C. § 1533(a).  If the Secretary determines that critical habitat is "not determinable,"

the Secretary is allowed additional time of up to one year to designate the critical habitat.

_____

[3]      The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range.  16 U.S.C.A. § 1532(6).  The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.  16 U.S.C.A. § 1532(20).

[4]      The term "critical habitat" for a threatened or endangered species means: (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside of the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.  16 U.S.C. § 1532(5)(A).

[5]      According to Regulations promulgated by the Secretary, a finding of "not prudent" can only be made when: (1) the species is threatened by taking or other human activity and the identification of habitat can be expected to increase the degree of threat to the species; or (2) designation of critical habitat would not be beneficial to the species. 50 C.F.R. § 424.12(a)(1)(i) & (ii).

[6]      According to the same Regulations promulgated by the Secretary, *supra FN 5,* a finding of "not determinable" is only appropriate when: (1) information sufficient to perform required analysis of the impact of designation is lacking; or (2) the biological needs of the species are not sufficiently well known to permit identification of an area as critical habitat. 50 C.F.R. § 424.12(a)(1)(i) & (ii).

At the end of that one year extension, the Secretary *must* publish a final listing of critical habitat regulation in the Federal Register, to the extent prudent, based on the then available information. 16 U.S.C. § 1533(b)(6)(C)(emphasis added).

If the Secretary does not make a final critical habitat determination within the allotted time period, a citizen suit may lie.  Section 11 of the ESA authorizes suits against the Secretary:

> Any person may commence a civil suit on his own behalf... (C) against the Secretary where there is alleged *failure of the Secretary to perform* any act or *duty* under section 1533 of this title *which is not discretionary* with the Secretary.

16 U.S.C. § 1540(g)(1)(c)(emphasis added).  Because the ESA does not have a specific statute of limitations provision, the general statute of limitations provision which governs civil actions brought against the federal government codified at 28 U.S.C. § 2401(a) controls.  28 U.S.C. § 2401 provides, "[e]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the *right of action first accrues*." (emphasis added).

This case involves such a citizen suit, jurisdiction grounded in the statute, seeking declaratory and injunctive relief for the Secretary's failure to perform his non-discretionary duty to designate the critical habitat of the Louisiana Black Bear.  This is not the first instance where a Court has been called upon by citizens to compel the Secretary of the Interior to execute his congressional mandate and non-discretionary duty to designate critical habitat.  As noted by the presiding judge in *Southern Appalachian*

-4-

*Biodiversity Project v. U.S. Fish and Wildlife Services,* 181 F.Supp.2d 883, 886 (E.D.

Tenn. 2001):

> Stated crassly and starkly, it is money - more accurately, the lack of money -
> that has precipitated this suit and others like it. Congress has charged the Fish
> and Wildlife Service with the responsibility of identifying endangered or
> threatened species and the critical habitat for those species. To state the
> obvious, it requires money to fulfill this statutory duty. Unfortunately for all
> concerned, Congress has declined to curtail the scope of the Fish and Wildlife
> Service's duties under the Endangered Species Act, yet has refused to
> adequately fund the Service to enable it to carry out those duties. As a result,
> the designation of critical habitat is now driven almost exclusively by
> litigation. Of course, a court is concerned only with the issues and parties
> before it in any given suit. Upon finding that the Fish and Wildlife Service has
> not fulfilled its statutory duty to designate critical habitat, an injunction to do
> so is essentially the only alternative available to the court. As time has passed,
> the Service now finds itself confronted with a plethora of suits and injunctions;
> it must devote its limited resources to comply with judicial orders at the
> expense of curtailing or even abandoning its search for as-yet-unidentified
> endangered species. As injunction is heaped upon injunction, the Service's
> problems are compounded; to comply with the requirements of one court's
> injunction may require it to delay compliance with the orders of another court,
> and so it goes.

## II. PROCEDURAL HISTORY

*"It is dangerous to be right when the government is wrong." - Voltaire (1694 - 1778)*[7]

The facts underlying this litigation *are not disputed.*[8]  On March 6, 1987, plaintiff

Harold Schoeffler (Schoeffler) and others petitioned the Secretary of the Interior to list

---

[7]    Originally stated as, "*Il est dangereux d'avoir raison dans des choses où des hommes accrédités ont tort,*" from "Catalogue pour la plupart des écrivains français qui ont paru dans Le Siècle de Louis XIV, pour servir à l'histoire littéraire de ce temps," *Le Siècle de Louis XIV* (1752) (also attributed as "It is dangerous to be right in matters where established men are wrong.").

[8]    *Defendant's Statement Regarding Material Facts*, p. 1.

the Louisiana Black Bear as a threatened species under the Endangered Species Act, 16 U.S.C § 1531, *et seq*.  On August 19, 1988, the Secretary, acting through the United States Fish and Wildlife Service (hereinafter collectively referred to as "defendant" or "the Secretary"), determined that "petitioners have presented substantial information that petitions to list the Louisiana Black Bear . . . may be warranted."[9]  The Secretary further stated that "the actions requested are warranted but precluded by other actions to amend the lists."  On August 10, 1989, the Secretary again determined that listing the Louisiana Black Bear was "warranted but precluded by other actions to amend the lists."[10]  Plaintiffs point out that "[i]n doing so, the Secretary concluded [that] the Bear's continued existence was threatened by habitat loss and illegal killing."  Despite recognition that the loss of habitat threatened the bear's survival, the Secretary concluded incongruously, that it was not prudent to propose a critical habitat designation for the Bear."[11]  On June 21, 1990, the Secretary proposed listing the Louisiana Black Bear as a threatened species throughout its historic range and requested comment and relevant data from the public.[12] When this expected legal protection again did not materialize, Schoeffler joined others in

---

[9]    Endangered and Threatened Wildlife and Plants;  Notice of Findings on Petitions to List the Louisiana Black Bear, Lower Keys Marsh Rabbit, and Sherman's Fox Squirrel, 53 Fed. Reg. 31, 723 (Aug. 19, 1988).

[10]    Endangered and Threatened Wildlife and Plants;  Notice of Finding on Petition To List the Louisiana Black Bear, 54 Fed. Reg. 32, 833 (Aug. 10, 1989).

[11]    *Plaintiffs' Motion*,  pp. 5-6 [Rec. Doc. 5].

[12]    See Endangered and Threatened Wildlife and Plants; Proposed Threatened Status for the Louisiana Black Bear. Proposed Designation of Threatened by Similarity of Appearance of all Bears of the Species Ursus americanus Within the Historic Range of U. a. luteolus, 55 Fed. Reg. 25, 341 (June 21, 1990).

filing suit in the Eastern District of Louisiana, on December 23, 1991, seeking a final ruling listing the Louisiana Black Bear as a threatened species under the ESA.[13]

On January 7, 1992, the Secretary listed the Louisiana Black Bear as a threatened species under the ESA, and stated that the bear's critical habitat was "not then determinable."  This determination provided the Secretary a one year extension in which to fulfill his congressional mandate. 16 U.S.C.§ 1533 *et seq.*  Nonetheless, January 7, 1993 passed without the Secretary publishing a critical habitat as required by the ESA.

On December 2, 1993, the Secretary proposed to designate critical habitat in the Tensas River Basin, the Atchafalaya River Floodway, and in lower Iberia and St. Mary's Parishes.[14]  Again, the proposal did not develop into a final determination, and on March 7, 1994, the Secretary again proposed designated habitat and set a hearing to solicit public comment.[15]  The proffering again proved unproductive.  On April 1, 1994, the Secretary yet again announced solicitation of public comment and gave notice of public hearings on the proposed designation of critical habitat.[16]  On September 27, 1995, the Secretary, in

---

[13]       See *Defenders of Wildlife v. Lujan*, 1992 WL 124796 (E.D. La. 1992). The suit was ultimately dismissed with prejudice as moot on March 18, 1992.

[14]       See Endangered and Threatened Wildlife and Plants;  Proposed Designation of Critical Habitat for the Louisiana Black Bear, 58 Fed. Reg. 63,560 (Dec. 2, 1993).

[15]       See Endangered and Threatened Wildlife and Plants;  Reopening of Comment Period and Public Hearing on Proposed Designation of Critical Habitat for the Louisiana Black Bear, 59 Fed. Reg. 10,607 (March 7, 1994).

[16]       See Endangered and Threatened Wildlife and Plants;  Extension of Comment Period and Public Hearings on Proposed Designation of Critical Habitat for the Louisiana Black Bear, 59 Fed. Reg. 15,366 (April 1, 1994).

conjunction with the Black Bear Conservation Committee, published a Recovery Plan that acknowledged that the designation of critical habitat was still in progress and under review.[17]  None of the proposals were ever adopted, and the Secretary has yet to designate and publish the Louisiana Black Bear's critical habitat as required by law.

On September 5, 2005, after more than twelve-years of hopeful but ultimately unsuccessful colloquy between plaintiffs and the Secretary, throughout which plaintiffs claim they relied on the Secretary's representations and actions, plaintiffs filed the instant suit seeking declaratory and injunctive relief pursuant to the Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

On October 7, 2005, plaintiffs filed the Motion for Summary Judgment [Rec. Doc. 5] now before the Court, to which the United States Secretary of the Interior[18] filed a Response Memorandum and Court-Ordered Supplemental Briefing on the Continuing Violations Doctrine [Rec. Doc. 18] in opposition thereto, to which plaintiffs' filed a Reply [Rec. Doc. 24].  The Secretary filed a Motion to Dismiss [Rec. Doc. 12] on November 11, 2005, plaintiffs filed a Memorandum in Opposition thereto [Rec. Doc. 17], to which the Secretary filed a Reply [Rec. Doc. 25].[19]  Based on the substance of the

---

[17]      U.S. Fish and Wildlife Service. 1995. Louisiana Black Bear Recovery Plan. Jackson, Mississippi. The Plan can be viewed at www.bbcc.org/web/images/stories/information/pdf/Recovery_plan.pdf.

[18]      Gale  Norton was the United States Secretary of the Interior at the time the case was filed.  Dirk Kempthorne succeeded Norton as Secretary on May 26, 2006.

[19]      Also filed with the Court is an *Amicus Curiae* Brief submitted on behalf of the Black Bear Conservation Committee [Rec. Doc. 20], Plaintiffs' Response to *Amicus Curiae* Black Bear Conservation Committee [Rec. Doc. 26], Plaintiffs' Notice of Supplemental Authority [Rec. Doc. 27] and Defendant's Notice of Supplemental Authority [Rec. Doc. 28].

motions, the Court will construe the parties' motions as cross-motions for summary judgment.[20]  For the reasons that follow, plaintiffs' Motion for Summary Judgment [Rec. Doc. 5] will be GRANTED and defendant's Motion to Dismiss [Rec. Doc. 12] will be DENIED.

## III. APPLICABLE LAW

### A.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56;  *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994)(en banc).  Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id.* If the moving party fails to carry this burden, his motion must be denied. If he succeeds, however, the burden shifts to the non-moving party to show that there is a

---

[20]   "If a court considers materials outside of the pleadings, the motion to dismiss must be treated as a motion for summary judgment under Rule 56(c)."  *Causey v. Sewell Cadillac-Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir. 2004).  Both parties have submitted affidavits and exhibits in support of their respective positions, requiring the Court to convert defendant's Motion to Dismiss into a Motion for Summary Judgment.

genuine issue for trial.[21]  *Id.* at 322-23.  There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.  *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990).  If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for.  Fed. R. Civ. P. 56(c);  *Celotex Corp.*, 477 U.S. at 322.

Plaintiffs assert they are entitled to summary judgment as a matter of law and an injunction compelling the Secretary to comply with the ESA because it is undisputed that the Secretary of the Interior has "violated a mandatory, non-discretionary duty to designate, and thereby to protect, the 'critical habitat' of the Louisiana Black Bear under the Endangered Species Act and, the Secretary has "yet to take final action on her proposed rule to designate critical habitat for the Louisiana Black Bear."  (*Plaintiffs' Motion,* p. 1, 7, Rec. Doc. 5).

The defendant does not dispute the fact that it remains in violation of the statute, but argues that the Court should dismiss plaintiffs' complaint for lack of subject matter jurisdiction.  The Secretary argues that the absoluteness of its duty under the ESA ultimately is of no moment within the confines of this case because plaintiffs' right and ability to compel performance of that duty has lapsed; the claims are time-barred under

---

[21]     Where  the nonmoving party has the burden of proof at trial, the moving party does not have to produce evidence which would negate the existence of material facts. It meets its burden by simply pointing out the absence of evidence supporting the non-moving party's case. *Celotex Corp.,* 477 U.S. at 325.  To oppose the summary judgment motion successfully, the non-moving party must then be able to establish elements essential to its case on which it will bear the burden of proof at trial. A complete failure of proof by the non-moving party of these essential elements renders all other facts immaterial. *Id.* at 322.

the applicable statute of limitations, 28 U.S.C. § 2401(a); and it is immune from suit under the doctrine of sovereign immunity, regardless of whether its legal obligation under the ESA remains. (*Defendant's Motion,* Rec. Doc. 12).

In reply, plaintiffs argue that the statute of limitations has not run and contend that the Secretary's mandatory duty to designate critical habitat was not discharged at the time the Secretary first failed to abide by the ESA's deadline.  Plaintiffs also argue that the Secretary's continued non-compliance from 1993 until the present creates a new cause of action with each passing day, thus tolling the statute of limitations.  Each of plaintiffs' arguments will be addressed in turn.

As the defendant's assertion advanced in its Motion to Dismiss [Rec. Doc. 12], if it were to prevail, would divest the Court of jurisdiction, the Court must address this threshold issue first.

## B.   THE STATUTE OF LIMITATIONS & SOVEREIGN IMMUNITY

The basis for defendant's argument that the Court lacks subject matter jurisdiction over this action is, in short, that the action is time barred, thus sovereign immunity precludes judicial review.  As stated by defendant, "[s]tatutes of limitation represent a legislative judgment that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.' " (*Defendant's Motion*, p. 9, *citing United States v. Kubrick*, 444 U.S. 111, 117 (1979)).  Where suit is brought against the United States, or its officers in their official capacity, issues of sovereign immunity are raised because the statute of limitations is a condition of the waiver of sovereign immunity.  *Kubrick*, 444 U.S. at 117-

-11-

18; *United States v. Mottaz*, 476 U.S. 834, 841 (1986); *Dunn-McCampbell Royalty Interest, Inc. v. National Park Service*, 112 F.3d 1283, 1287 (5th Cir.1997).  In sum, defendant argues that the six-year statute of limitations imposed by 28 U.S.C. § 2401(a) has long since run, *ergo*, based on the doctrine of sovereign immunity the Court is deprived of jurisdiction over this matter.

The judicial grant of sovereign immunity bars lawsuits against the United States unless the Congress has explicitly waived its immunity, such as through the Federal Torts Claims Act or the Tucker Act.[22]  *See United States v. Dalm,* 494 U.S. 596, 608 (1990); *Koehler v. United States,* 153 F.3d 263, 265 (5th Cir. 1998).  As the United States Supreme Court wrote in *United States v. Sherwood*, 312 U.S. 584, 586 (1941), "(t)he United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of consent to be sued in any court define that court's jurisdiction to entertain the suit;" and in *United States v. Testan*, 424 U.S. 392 (1976) (*quoting Sherwood*, 312 U.S. at 587-88 (1941)): "... except as Congress has consented to a cause of action against the United States, 'there is no jurisdiction . . . to entertain suits against the United States.' " If the United States has not consented to be sued, the Court lacks jurisdiction and the action must be dismissed.  *Dalm,* 494 U.S. at 608.

---

[22]  The doctrine of sovereign immunity springs from early English common law where the king was immune from suit by his subjects. It was believed that a king ruled by divine right, hence the idea that "the king can do no wrong."  It is also based on the concept that since all rights and laws flow from the sovereign, there can be no legal right or redress against the authority that makes the law on which the very right depends, thus a king could not be held accountable in courts of his own creation.  There is no constitutional basis for sovereign immunity; it is a judicial doctrine enunciated by the Supreme Court of the United States soon after the Court was created.  *See Chisolm v. Georgia*, 2 US 419 (1793); *Cohens v. Virginia*, 19 US 264 (1821); *Clarke v. United States*, 19 US 436 (1834).

-12-

When the United States has consented to be sued, the terms of its consent circumscribe the Court's jurisdiction.  *Id.*  The statute of limitations is one such term that operates to narrow the waiver of sovereign immunity, and failure to sue the United States within the limitations period is not merely a waivable defense but operates to deprive federal courts of jurisdiction.  *See United States v. Williams,* 514 U.S. 527 (1995);  *Gandy Nursery, Inc. v. U.S.,* 318 F.3d 631 (5th Cir. 2003);  *Dunn-McCampbell Royalty Interest, Inc. v. National Park Service,* 112 F.3d 1283, 1287 (5th Cir. 1997).[23]

The citizen suit provision of Section 11 of the ESA is a congressional waiver of sovereign immunity where there is an alleged failure of the Secretary to perform any act or duty under section 1533 which is not discretionary.  16 U.S.C. § 1540(g)(1)(c).  The general six year statute of limitations of  28 U.S.C. § 2401(a) controls;  consequently, "a civil suit is seemingly barred if the right to bring it first accrued more than six years prior to the date of filing the suit."  *Crown Coat Front Co. v. United States,* 386 U.S 503, 510 (1967).

It is undisputed that the Secretary violated the provisions of the ESA when it failed to publish a final regulation designating critical habitat for the Louisiana Black Bear in the Federal Register on or before January 7, 1993. 16 U.S.C.A. § 1533(b)(6)(c).  The Secretary's violation and failure to observe the non-discretionary congressional mandate continues to date.  However, plaintiffs must show either that their right of action did not

---

[23]        *But see, c.f. Calhoun County v. United States*, 132 F.3d 1100, 1104-05 (5th Cir. 1998) (noting a split among other circuits as to the jurisdictional nature of statutes of limitations applying to the United States).

accrue on January 7, 1993, but at a later point, within six years of the filing of their Complaint, or that the statute of limitations has otherwise been tolled.  If plaintiffs fail to meet their burden, their claims are untimely and this Court has no jurisdiction over the matter.

Defendant asserts that the Secretary's failure to designate and publish a critical habitat for the Louisiana Black Bear within one year of making a "not determinable" finding was the point at which plaintiffs' right of action began to accrue.   Defendant argues that on January 7, 1993, when the deadline passed without the Secretary acting, the statute of limitations was triggered.  Therefore, plaintiffs' right to bring this litigation expired six years later on January 7, 1999, regardless of whether the Secretary remains in violation of his mandate.

Plaintiffs oppose defendant's Motion to Dismiss arguing that the passing of the one-year extension without closing the not-determinable finding did not constitute final agency action from which their claims began to accrue as the Federal Wildlife Service did not issue a finalized ruling.  Although it was clear that the Secretary disobeyed the law by disregarding the deadline, plaintiffs submit that the infraction appeared to be a minor procedural mishap in the course of the apparent continuing effort by the Secretary to ultimately fulfill the mandate.  Plaintiffs contend that they thought it premature to challenge the Secretary's initial violation because the deadline passed in the midst of continuing efforts by the Federal Wildlife Service, and was followed by a series of proposed rules.  Plaintiffs further contend that the Secretary's subsequent actions and

representations to plaintiffs did not indicate a definitive statement that the Secretary was not going to abide by the law, but rather that the agency's decision-making process was ongoing and without final resolution.  Plaintiffs assert that they have never been told by defendant, nor has defendant ever indicated, that it intends to abandon its proposed rule to designate critical habitat for the black bear.  However, plaintiffs grew "tired of waiting for the Secretary's promised 'some day intentions' to become a reality." (*Plaintiffs' Opposition,* p. 14).

28 U.S.C. § 2401 provides that the statute of limitations is triggered when "the right of action first accrues."   "[A] cause of action against an administrative agency 'first accrues,' within the meaning of § 2401(a), as soon as . . . the person challenging the agency action can institute and maintain a suit in court."[24] *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 56 (D.C. Cir. 1987).  In the Fifth Circuit, the general rule is that a cause of action emerges when the alleged wrong occurs.  *Dore v. Kleppe,* 522 F.2d 1369, 1373 (5th Cir. 1975); *United States v. One 1961 Red Chevrolet Impala Sedan*, 457 F.2d 1353, 1358 (5th Cir. 1972).  Generally, a cause of action accrues when a party has either actual or constructive knowledge of the violation and a right to enforce his claim.  *See Vigman v. Community National Bank & Trust Co.*, 635 F.2d 455, 459 (5th Cir. 1981).

---

[24]    According to one court, the  28 U.S.C. § 2401 statute does not run against a plaintiff who is unaware of a cause of action, whether because the defendant concealed the relevant facts or because the injury was inherently unknowable at that point in time. *Navajo Nation v. United States*, 46 Fed. Cl. 217, 225 (Fed. Cl. 2000), rev'd on other grounds, 263 F.3d 1325 (Fed. Cir. 2001), rev'd, 537 U.S. 488 (2003). Also, in *City of Moses Lake v. United States*, 2005 WL 3591924 (E.D. Wash. 2005), the court stated that a Federal Tort Claims Act claim against the United States accrues pursuant to 28 U.S.C. § 2401 when the plaintiff knows both the existence and the cause of his or her injury, even if he or she does not know that a cause of action has accrued. *Id.* at 7-8 (*citing United States v. Kubrick*, 444 U.S. 111, 123 (1979)).

Accordingly, the Secretary posits that plaintiffs' cause of action accrued on the day plaintiffs could first have successfully initiated and maintained a suit based on the cause of action. (*Defendant's Motion*, p. 12). Under the facts of this case, the Secretary would direct the Court's inquiry to the point at which plaintiffs had either actual or constructive knowledge of the violation, citing *Vigman,* 635 F.2d at 459. Defendant argues that plaintiffs' cause of action accrued when the Secretary violated his non-discretionary duty by failing to make and publish a timely final critical habitat determination on January 7, 1993, the statutorily imposed deadline. (*Defendant's Motion*, p. 12).

The Court holds, based on the record before it, that plaintiffs' cause of action did not accrue on January 7, 1993, and the statute of limitations did not consequently expire on January 7, 1999. Defendant's conduct and representations since its initial determination that a critical habitat was prudent, although not yet determinable, evidenced that defendant was taking the necessary steps to designate critical habitat for the Louisiana Black Bear, seemingly at the earliest point possible. The Secretary's not determinable finding was followed by subsequent action whereby the defendant, at least superficially, attempted to comply with the legal mandate by proposing rules, accepting public comments, holding public hearings, and even promising that critical habitat designation would be forthcoming. This all confirmed plaintiffs' reasonable, good faith belief that the Secretary would ultimately comply with the law, even if at a time after the statutory deadline. The record does not suggest that plaintiffs had actual or constructive knowledge that it was necessary to institute suit on or before January 7, 1993.

-16-

Since the passing of the statutory deadline, the Secretary has never issued a "not prudent" determination nor listed a final habitat designation; rather the Secretary has maintained the interim "not yet determinable" finding and by all appearances and representations, has further extended the course of his investigation into the matter. The Secretary offered proposals several times over the course of a decade without ever making a final habitat listing or a "not prudent" determination, which are the Secretary's only two options to fulfill his obligation under the law. Thus, the agency determination remained open pending a final determination. *See Natural Resources Defense Council v. U.S. Dept. of Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997); *Wild Alabama v. Babbitt*, No. CV-99-0093-S (N.D. Ala. Sept. 7, 1999); *Missouri v. Secretary of the Interior*, 158 F. Supp. 2d 984 (W.D. Mo. 2001) (cited for the proposition that the Secretary's "not prudent" determination qualifies as final agency action, while the Secretary's "not determinable" determination does not).

Under the ESA, the Secretary should have completed the process by the provided deadline; and the statutory violation is arguably such that, under circumstances other than those present in this case, would constitute such action that would trigger the statute of limitations. Without question, had the Secretary issued a "not prudent" decision or designated habitat, either ruling would have been final agency action, concretely and definitively affecting plaintiffs' interest, thus triggering the statute of limitations. However, the Secretary's "not determinable" finding, followed by affirmative official action, did not carry the same indicia of finality as the publication of a final regulation

would have; it was a mere threshold determination followed by further inquiry and action.

Plaintiffs were led to believe that such designation would in fact be made, albeit late, but

better late than never.

Moreover, based on the record in its entirety, the Court finds that it is both

reasonable and plausible that plaintiffs would not have been alerted to the significance of

the non-action violation merely marked by the passage of time.  The record supports

plaintiffs' claim that the circumstances did not lead them to conclude that the Secretary's

failure to timely act was actually a final decision to remain in absolute violation of the

congressional mandate and to completely abdicate his responsibilities, particularly in light

of the subsequent course of proposals.[25]  At no point did the Secretary or anyone else

associated with the FWS indicate any intent to abandon or otherwise unfavorably

terminate the course of action plaintiffs reasonably believed defendant had embarked. The

Secretary's obligation to follow the law, to do what the Department of Interior was legally

obligated to do, and what the FWS represented that it would do, did not cease simply

because the proscribed deadline for compliance passed.   Plaintiffs could not have

inferred from the circumstances in general, and the Secretary's non-compliance in

particular, that the defendant's ongoing failure to finalize a habitat determination should

be perceived as a situation of adverse action, rather than bureaucratic bungling or foot

---

[25]        A plausible alternative view based on the record before the Court, but by no means the only alternative view for the defendant's action/non-action, if the Court were to accept the defendant's position as correct, is that the defendant's subsequent course of actions and proposals were mere pretext for lulling plaintiffs into a false sense of security that action would be taken by defendant, merely for the purpose of allowing the statute of limitations to run.

dragging.

In sum, considering the defendant's course of action over an extended period of time, which from the record is uncontested, the Secretary's failure to comply with the law did not carry the weight of a definitive statement of the agency's position, nor did it suggest that plaintiffs' had actual or constructive notice of a right of action.  The Court therefore rejects defendant's contention that the passing of the deadline in violation of the statute was the point at which plaintiffs' cause of action under the ESA accrued.  As soon as plaintiffs came to believe that further dealings with defendant were futile, they gave the required notice to sue and then filed suit.[26]  The Court finds, therefore holds that plaintiffs timely filed their Complaint.

## C.     THE CONTINUING VIOLATIONS DOCTRINE

The Court is not required to address plaintiffs' alternative argument under the continuing violations doctrine as a result of the Court having found in plaintiffs' favor that their claims are not barred by the statute of limitations.[27]  The Court will nonetheless address plaintiffs' alternative assertion, finding, therefore holding that had defendant prevailed on the issue of the accrual of the statute of limitations, this Court would continue to retain jurisdiction to resolve the issues between the parties to this litigation.

---

[26]      This case illustrates the tricky interplay between the doctrine of sovereign immunity and the principles underlying citizen suit provisions.  Here, the statutory scheme forming the basis of the citizen complaint involves a mandatory duty and set deadlines, and in the event of violation, the statute provides recourse by way of the citizen suit to compel action and enforce the mandatory duty established by Congress.  Such dynamics are in line with Constitutional principles of separation of powers and checks and balances.

[27]      The Court required the parties to file supplemental briefing on the continuing violations doctrine and specifically the case of *Mayberry v. Conoco, Inc.,* 2001 WL 1751461 (5th Cir. 2001).

Plaintiffs assert that the Secretary's failure to designate a critical habitat timely, and as of today, at all, is a continual violation of an ongoing non-discretionary duty. Invoking the continuing violations doctrine, plaintiffs argue that the statute of limitations has not run because each day that has passed wherein the Secretary has failed to perform his non-discretionary duty constitutes a new actionable violation.

Defendant "has never questioned the existence of the continuing violations doctrine in this Circuit, but does question its applicability to the circumstances of this case." (*Defendant's Reply,* p. 18).  Specifically, defendant argues that plaintiffs have provided no evidence establishing "a series of related acts, one or more of which falls within the limitations period," or that a "link" exists between conduct occurring within the relevant period and the violation that occurred before the relevant time period.  (*Id.*)  Accordingly, defendant argues, "the continuing violations doctrine does nothing to save Plaintiffs' claims from dismissal." (*Id.*).

The continuing violations doctrine permits a plaintiff to sue on a claim that would be time-barred if considered in isolation, but where subsequent violations act to prevent accrual or otherwise toll the limitations period.  The United States Court of Appeals for the Fifth Circuit has recognized the viability of the continuing violations doctrine to toll the statute of limitations.  *See Mayberry v. Conoco, Inc.,* 2001 WL 1751461(5th Cir. 2001); *Lariscey v. Smith,* 1995 WL 535012, 4 (5th Cir.1995);  *Hendrix v. City of Yazoo City, Miss.,* 911 F.2d 1102, 1103 (5th Cir. 1990).  The scope of the doctrine is unclear,

and the United States Supreme Court has not ruled on the issue .[28]  While the doctrine has

not been applied in the Fifth Circuit in an ESA citizen suit against the government, it has

been applied by other federal courts to toll the 28 U.S.C. § 2401 statute of limitations in

citizen suits with fact patterns similar to the present one in which the government owed a

continuing duty to the plaintiff.[29]

---

[28]     "Case law on the subject of continuing violations has been aptly described as 'inconsistent and confusing. . .'" *Dumas v. Town of Mount Vernon,* 612 F.2d 974, 977 (5th Cir. 1980); *Scarlett v. Seaboard Coast Line R. Co.,* 676 F.2d 1043, 1049 (5th Cir. 1982). Though courts have seldom attempted to delve into its origins or theoretical underpinnings, at least one court considers the theory, or certain of its aspects, to be analogous to the concept of a continuing trespass in tort law.  *See Thompson v. Sawyer,* 678 F.2d 257, 290 (D.C.Cir. 1982) (citing Restatement (Second) of Torts § 899(d)) . . .[t]his analogy does [not] appear to have been employed to distinguish between those violations that are, and those that are not, "continuing."  *Berry v. Board of Sup'rs of L.S.U.* 715 F.2d 971, 979 -980 (5th Cir.1983)

[29]     The federal circuits are split as to whether plaintiffs in suits alleging agency noncompliance with statutory deadlines may be able to avoid the statute of limitations by application of the continuing violation doctrine. The D.C. Circuit has applied the continuing violations doctrine to toll the statute of limitations in cases involving government agency inaction.  *See The Wilderness Soc. v. Norton,* 434 F.3d 584 (D.C. Cir. 2006) (holding that the six-year, general federal statute of limitations for civil actions against the United States does not apply to actions under the APA to compel agency action unlawfully withheld or unreasonably delayed because the plaintiff in such a suit seeks redress for an alleged continuing violation).  Numerous un-appealed federal district court decisions have also considered the applicability of the doctrine. *See. e.g. Modern, Inc. v. Florida*, 2006 WL 1679347, 5 (M.D. Fla. 2006); *Heartwood v. Norton,* 2005 WL 2656733 (S.D. Ohio. 2005); *Central Pines Land Co. v. United States*, 61 Fed. Cl. 527, 537 (Fed. Cl. 2004); *Boling v. United States*, 220 F.3d 1365, 1373 (Fed. Cir. 2000); *Fallini v. United States*, 56 F.3d 1378, 1381 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1243 (1996) (*citing United States v. Dickinson*, 331 U.S. 745 (1947)(providing that the statute of limitations does not begin to run until the challenged government actions have stabilized.)).

          In *Southern Appalachian Biodiversity Project v. United States Fish & Wildlife Serv*., 181 F. Supp. 2d 883 (E.D. Tenn. 2001), an environmental organization charged that the FWS failed to designate critical habitat for endangered and threatened species under the ESA despite the passage of the statutory deadline for doing so. As in this litigation, the FWS argued that the statute of limitations began running the day after the expiration of the statutory deadline, but the court concluded that the agency's non-action constituted a continuing violation so that the statute of limitations began running anew each day that the agency failed to take action. "In short, the statute of limitations has never commenced to run." *Id.* at 887.  In *Center for Biological Diversity v. Hamilton*, 385 F. Supp 2d 1330 (N.D.Ga. 2005), the court framed the issue as "not whether Congress intended for Defendants to comply with their statutory duty to designate critical habit for endangered species--it clearly did--but whether Congress intended to allow private parties to enforce this duty at *any* time after it is violated;" and declined to "ignore the ESA's plain text...and imply a continuing duty." *Id.* at 1338-1339. On appeal, the Eleventh Circuit, in affirming the district court's ruling, firmly rejected the reasoning of *Southern Appalachian Biodiversity Project*, holding that a challenge to the FWS's failure to designate critical habitat amounted to a complaint about the continuing effects of the agency's failure to determine the critical habitat by the statutory deadline, a one-time violation of the ESA. 453 F.3d 1331, 1335 (11th Cir. 2006).  The Eleventh Circuit noted that it had previously limited the application of the continuing violations doctrine to situations in which a reasonably prudent plaintiff would have been able to determine that a violation had occurred, and such a plaintiff would have been aware of the violation on the day after the statutory deadline *Id.* at 1335- 36. The Eleventh Circuit stated that application of the continuing violation doctrine to be most

-21-

Only continuous unlawful acts or a series of separate wrongful actions can form the basis of a continuing violation.  In such situations, each breach gives rise to a separate cause of action and the plaintiff may sue for any breaches that occur within the limitations period. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558 (1977).  In the Fifth Circuit: "[T]he continuing violations theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Mayberry,* 2001 at 3;  *Messer v. Meno,* 130 F.3d 130, 134 (5th Cir.1997) (citing *Berry v. Bd. of Sup'rs of LSU,* 715 F.2d 971, 979 (5th Cir. 1983)).   There must be a continuation of the initial violation into the present, and not simply a discrete one-time violation with lingering effects or consequences.  *McGregor v. Louisiana State University Bd. of Sup'rs,* 3 F.3d 850, 867 (5th Cir. 1993).[30]  A plaintiff must provide evidence linking conduct

---

consistent with the principle that waivers of sovereign immunity be interpreted narrowly. *Id. See also Gros Ventre Tribe v. United States,* 344 F. Supp. 2d 1221, 1229 n.3 (D. Mont. 2004) (stating that the "continuing violations" doctrine evolved in the context of tort and nuisance law and does not apply in the context of an APA claim for judicial review) (*Aff'd but issue not addressed in Gros Ventre Tribe v. U.S.*, 469 F.3d 801 (9th Cir.2006) (*Pet. for Cert. filed Jun 14, 2007, NO. 06-1672)*).  Based on the uncontested facts before this Court, the reasoning of the Eleventh Circuit will be distinguished as set out hereinafter.

[30]     The doctrine does not apply where a single government action or "seminal event" causes a series of deleterious effects, even though the effects may extend long after the initial breach. In *Heartwood v. Norton*, 2005 WL 2656733 (S.D. Ohio 2005), plaintiffs challenged a series of biological opinions issued by the FWS under the ESA. The court stated that the continuing violations doctrine applies only in the event of a continuing series of illegal acts, rather than the continued ill effects of a single violation. The court found that the biological opinions represented single episodes of singular alleged illegal conduct, and thus concluded that the continuing violations doctrine did not apply. *See also Dalles Irrig. Dist. v. United States*, 71 Fed. Cl. 344, 351 (Fed. Cl. 2006) (*quoting Brown Park Estates-Fairfield Dev. Co.. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997) (holding the continuing claim doctrine applied to a breach of contract action against the United States because the claim for breach was "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages.")); *Central Pines Land Co. v. United States*, 61 Fed. Cl. 527, 537-40 (Fed. Cl. 2004) (denying summary judgment where the record did not contain sufficient facts to determine whether the continuing claims doctrine applied); *Fallini v. United States*, 56 F.3d 1378, 1383 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1243 (1996).

occurring within the relevant statutory period to the original actionable conduct that occurred outside the limitations period.

In *Hendrix,* 911 F.2d at 1103-04, the court explained the distinction between a single statutory violation and continuing violations.  Noting that the distinction "is as much a matter of perspective and history as logic," the court distinguished between the two types of violations:

> [T]he continuing violation doctrine embraces two types of cases. The first includes cases in which the original violation occurred outside the statute of limitations, but is closely related to other violations that are not time-barred. In such cases, recovery may be had for all violations, on the theory that they are part of one, continuing violation. *Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982); *Glass v. Petro-Tex Chemical Corp,* 757 F.2d 1554 (5th Cir.1985); *Berry v. Board of Supervisors,* 715 F.2d 971 (5th Cir.1983).
>
> The second type of continuing violation is one in which an initial violation, outside the statute of limitations, is repeated later; in this case, each violation begins the limitations period anew, and recovery may be had for at least those violations that occurred within the period of limitation. *Jackson v. Galan,* 868 F.2d 165 (5th Cir.1989); *Perez v. Laredo Junior College,* 706 F.2d 731 (5th Cir.1983).

Also, in *Glass v. Petro-Tex Chem. Corp.,* 757 F.2d 1554, 1560-61 (5th Cir. 1985), a Title VII case, the court explained:

> The core idea of the continuing violations theory, however, is that equitable considerations may very well require that the filing periods not begin to run until facts supportive of a Title VII charge or civil rights action are or should be apparent to a reasonably prudent person similarly situated. The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights. At the same time, the mere perpetuation of the effects of time-barred discrimination does not constitute a violation of Title VII in the absence of independent actionable conduct occurring within the statutory period. (quotations, citations omitted).

The Fifth Circuit further elaborated that plaintiffs can avoid a limitations bar for an event that fails to fall within the statutory period where there is "[a] persisting and continuing system of [actionable conduct] that produces effects that may not manifest themselves as individually discriminatory except in cumulation over a period of time." *Id.* at 1561.  *See also Rendon v. AT & T Technologies,* 883 F.2d 388, 395-96 (5th Cir. 1989);  *Alldread v. City of Grenada,* 988 F.2d 1425, 1430-32 (5th Cir. 1993).

This litigation arises from the Secretary's ongoing and continuous failure to perform his non-discretionary duty.  The Secretary missed the statutory deadline, and that may have constituted an actionable violation of the ESA.  However, the Secretary is unequivocally required  to designate critical habitat unless doing so would not be prudent, so the Secretary's duty under the law continues until the final regulation is published. Even if plaintiffs' right of action accrued when the deadline passed on January 7, 1993 and the statute of limitations expired six years, the Secretary's violation is ongoing and does not constitute a discrete one-time violation with lingering effects or consequences

Additionally, from the time of the no-action violation of the January 7, 1993 deadline until June 14, 2005, when the defendant last met with plaintiffs regarding plaintiffs' notice of intent to sue letter, the Secretary made continued representations to plaintiffs that the government was working on a critical habitat proposal and would eventually finalize the project.  (*Plaintiffs' Motion*, pp 13-14, Second Schoeffler Dec.]. The Secretary's representations and attempted proposals effectively "link" conduct occurring within the relevant period and up until the time plaintiffs filed suit, with

conduct that occurred outside of the relevant time period.  Applying the continuing

violations doctrine consistent with Fifth Circuit jurisprudence, the Court finds that the

record is replete with related acts and conduct occurring from the time of the initial

violation until the time of filing of this litigation, that properly link back to the initial

violation and limitation period. *See Mayberry* at 3;  *Messer,* 130 F.3d at 134 (citing *Berry,*

715 F.2d at 97).

Equitable considerations and the uncontested material facts before the Court,

further support application of the continuing violations doctrine.  The circumstances

surrounding the initial violation and the subsequent actions of the defendant are such that

a reasonable and similarly situated plaintiff would not have been alerted to the fact that a

violation had occurred giving rise to a right of action under the ESA.  *Glass,* 757 F.2d at

1560-61.  "The focus is on what event, in fairness and logic, should have alerted the

average lay person to act to protect his rights." *Id* at 1561.  Even if plaintiffs knew or

could have reasonably ascertained the Secretary's initial violation was actionable, the

Secretary subsequently made a number of representations to the plaintiffs, as well as

proposals to the public, indicating an intent to comply with the mandatory duty and

finalize the proposed rule.  *See Rendon,* 883 at 395-96;  *Hendrix,* 911 F.2d at 1103-04;

*Alldread,* 988 F.2d at 1430-32.  Plaintiffs reasonably relied on the Secretary's continued

representations that it was not going to violate the law, but would eventually act to

finalize the proposed rule designating critical habitat.  Considering the facts and

circumstances of this case, the Court must conclude that at the time of the initial violation

it was not reasonably apparent to plaintiffs that filing suit was necessary to protect their rights. *Glass,* 757 F.2d at 1561.

In reaching this conclusion, this Court acknowledges the holdings of other federal courts.  In *The Wilderness Soc. v. Norton,* 434 F.3d 584 (D.C. Cir. 2006), plaintiff appealed the ruling of the district court dismissing its claims under the Wilderness Act as time-barred under 28 U.S.C. § 2401(a) on the grounds that the statute of limitations had not run because defendant was in continuous violation of its statutory obligations. Although the circuit court did not make a final determination on the issue because it found that plaintiff lacked standing, it did note:

> The Society appears to be right in its contention that the District Court erred in dismissing the counts under the Wilderness Act and the specific enabling statutes as time-barred under 28 U.S.C. § 2401(a). This court has repeatedly refused to hold that actions seeking relief under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed" are time-barred if initiated more than six years after an agency fails to meet a statutory deadline...
>
> TWS claims that NPS has chronically failed to undertake various legal obligations with respect to the identification and management of "wilderness" in the National Park System. The Society's complaint alleges continuing violations by the Government. It "does not complain about what the agency has done but rather about what the agency has yet to do," *United Mine Workers,* 190 F.3d at 549. Under these circumstances, it is unlikely that TWS' complaint would be held by this court to be time-barred by 28 U.S.C. § 2401(a).

*Id.* at 588-589.  In reaching this conclusion, the D.C. Circuit considered other cases where suit was brought to compel agency action after an agency failed to meet its deadline but the agency argued that the suit was time-barred.  In *In re United Mine Workers of America International Union,* 190 F.3d 545 (D.C. Cir. 1999), the court ruled that,

"[b]ecause the [union] does not complain about what the agency has done but rather about what the agency has yet to do, we reject the suggestion that its petition is untimely." *Id.* at 549.  The decision in *In re Bluewater Network,* 234 F.3d 1305 (D.C. Cir. 2000) was also noted to be of the same effect.  There the court noted it was "faced with a clear statutory mandate, a deadline nine-years ignored, and an agency that has admitted its continuing recalcitrance." *Id.* at 1316.  Notwithstanding the fact that the statutory deadline had been missed by nine years, the court found the petition was timely. *Id.* at 1314.  Lastly, in *American Canoe Association, Inc. v. EPA,* 30 F. Supp. 2d 908, 925 (E.D. Va. 1998), in response to a citizen suit to compel the EPA to perform its duty under the Clean Water Act to approve or disapprove a planning process within thirty days, the Court noted that failure to perform a non-discretionary duty after a statutory deadline is a "continuing violation, which plaintiffs may challenge at any time provided the delay continues."

Based on the record before the Court, guided by Fifth Circuit parameters in non-ESA cases, as well as other circuit and district court precedents in ESA citizen suit cases, the continuing violations doctrine applies to the case at bar.  The Secretary's continuing failure to comply with his non-discretionary duty under the law constitutes a continuing violation with every day's nonfeasance.  The statute of limitations runs from the last day of the continuing offense.  The Court need not determine precisely when during the last six years plaintiffs' cause of action accrued;  the facts particular to this case show independent actionable conduct occurring within the statutory period, and link actionable conduct from the initial violation up until the time of filing suit.  Plaintiffs' effort to

compel the Secretary to perform its  non-discretionary duty under the ESA is not time-barred by the six year statute of limitations of 28 USC § 2401(a).

## IV.  RULING

Outside of the assertion that plaintiffs' claim is time-barred by the statute of limitations, the defendant proffered no other argument in support of its Motion to Dismiss or in defense to plaintiffs' Motion for Summary Judgment.  When there is a violation of a mandatory duty under the ESA, as is in the present case, a court must issue an injunction ordering the agency to act promptly in compliance with the statute, and the Court will order the Secretary to issue a final critical habitat determination for the Louisiana Black Bear.  *Forest Guardians v. Babbitt*, 173 F.3d 1178, 1192 (10th Cir. 1999).  The United States has not refuted that the plaintiffs would be entitled to injunctive relief if the Court found that it has jurisdiction to decide the case on the merits;  rather, it has requested only that the scope of any injunctive relief ordered be narrowly tailored.  The question of time limits to be imposed on the Secretary must now be addressed.

"Given the fact that the Secretary has delayed for 12 years in this case, solicited public comment twice, and promised action that was not forthcoming," plaintiffs would have the Secretary issue a final critical habitat determination within thirty (30) days. (*Plaintiffs' Motion,* p. 14).   Defendant contends this is not a reasonable time.   In its Response in Opposition, filed December 6, 2005, the defendant's estimated that a new proposed critical habitat rule could not be ready before November 30, 2007, and the resulting final critical rule could not be ready before November 30, 2008. (*Defendant's*

*Response,* p. 18). "The Service's present best estimate is that 'significant changes in the landscape and habitat threats . . . since the proposed critical habitat rule was published' will 'have rendered both the [1993] proposed critical habitat designation and the draft 1994 economic analysis obsolete." (*Defendant's Response,* p. 19 (citing attached Declaration of Renne Lohoefener at paras. 22, 50)).

In justifying the given estimate, defendant alleges that it will take twelve to fourteen months to complete withdrawal of the 1993 proposed rule and/or draft a new rule, and an additional twelve months to either convert the aged proposal or new proposed rule into a final critical habitat rule.  Defendant states that it must revisit the biological determination for the Louisiana Black Bear and its habitat, determine the geographic boundaries of any proposed critical habitat, make a prudence determination, prepare an analysis of the economic impact of the proposed rule, and generally subject any proposed rule to policy and legal review.  Any proposed rule must then undergo public comment and possibly public hearing and, based on the public input received, may undergo a revision that follows a similar process as that for drafting of the proposed rule, including a reviewed economic analysis.

Additionally, defendant contends that if this Court were to order it to make a finding within thirty days, it would be force to hastily prepare a determination that may have to be reevaluated later and could lead to further litigation.  Defendant points to other cases which support its argument that expedited timetables have led to poor results and the Department's decisions were reversed as arbitrary and capricious.

Plaintiffs have not asserted that there is an imminent, immediately dangerous threat to the Louisiana Black Bear or its habitat necessitating a hasty decision, nor have they presented any persuasive reason as to why the Court should adopt their proposed expedited thirty day timetable.

The Court, cognizant of the prescribed procedures for the promulgation of species listing and of critical habitat designations, is loath to interfere with defendant's internal processes unless absolutely warranted. Moreover, the Court empathizes with the administrative challenges defendant operates under, including insufficient funding by Congress, other agency funding constraints, backlog, and competing priorities. However, the Court is also cognizant of plaintiffs' desire to have resolution on an endeavor that first began in 1987. After at least twenty years of debate and deliberation over designating the critical habitat, two more years of delay is not only unnecessary, it is unreasonable.

The Court finds, therefore holds, that plaintiffs are entitled to injunctive relief requiring defendant, United States Secretary of the Interior Dirk Kempthorne, to designate critical habitat for the Louisiana Black Bear. The Court will deny plaintiffs' request for an accelerated compliance schedule of thirty (30) days as not necessitous or feasible. The Court will also deny defendant's requested timetable of an additional two years as neither reasonable nor appropriate under the facts of this case, based on defendant's own action/inaction in the Secretary's failure to comply with its non-discretionary duty under the ESA.

For the reasons set out hereinabove, the Court will deny defendant's Motion to Dismiss [Rec. Doc. 12] and grant plaintiffs' Motion for Summary Judgment [Rec. Doc. 5].

The United States Secretary of the Interior, the Honorable Dirk Kempthorne, the United States Department of Interior, and the Federal Wildlife and Fisheries Service have four (4) months from the date of entry of this Judgment to complete withdrawal of the 1993 proposed rule and/or create a new rule, and an additional eight (8) months from that date to either convert the prior proposal or a new proposed rule into a final critical habitat rule with publication in the Federal Register.

## V.   Conclusion

*"The Constitution is not an instrument for the government to restrain the people, it is an instrument for the people to restrain the government - lest it come to dominate our lives and interests." - Patrick Henry, 1736-1799* [31]

Critical habitat designations are essential to implementing the purposed protections of the ESA.  Nothing in the language of the ESA indicates that Congress intended that the Secretary's mandatory duty to designate critical habitat be discharged when the Secretary first fails to abide by a deadline.  The Secretary has an ongoing duty to comply with the law, even after the statutory deadline has passed.  In fact, it would be at odds with congressional intent and the serious purpose of this important legislation, to hold that the Secretary is only responsible for a timely performance, and that the Secretary

---

[31]     Patrick Henry, *Speeches given before the Virginia Ratifying Convention*, 4 and 5 June, 1788, reprinted in <u>The Anti-Federalist Papers and the Constitutional Convention Debates</u> (Ralph Ketcham ed.,.1985)

would only be in violation of the law for an instant of time at the passing of a deadline and no more once the deadline passed.  It is nonsensical that Congress intended that endangered animals be left unprotected simply because the time by which the protection should have been provided passed.  The Secretary still has the duty and the authority to act; it is logical and equitable that the citizen suit provision should also still be available to compel the required performance.

The discerning reasoning of Judge Lesiure in *Natural Resources Defense Council, Inc. v. Fox*,  909 F.Supp. 153, 159 (S.D.N.Y.1995), is apropos to this case:

> If that mode of enforcement [citizen suits] were to be foreclosed by a statute of
> limitations, the result will be far more than the unfortunate, but necessary
> foreclosure of rights caused by most statutes of limitations. Most statutes of
> limitations foreclose the enforcement of rights of general application. When one
> potential plaintiff loses the right to sue, the rule of law still remains in force. By
> contrast, where there is only one body charged with a duty by Congress, and that
> body cannot be forced by the Court to carry out its duty because of a statute of
> limitations, the practical result is a repeal of the mandatory duty itself. The statute
> [Clean Water Act] was enacted in order to create a perpetual scheme for protecting
> the nation's water quality, and does not evince an intent for the mandatory duties of
> the Administrator [EPA] to expire after a period of nonfeasance. The Act, like
> other acts of Congress, can be amended or repealed by subsequent action by
> Congress and the President. The practical effect of imposing a statute of
> limitations in a suit such as this is to repeal the mandatory duties established by
> Congress and the President without the constitutionally prescribed scheme for
> altering a statute of the United States.

If the citizens are precluded from compelling the Secretary to carry out his non-discretionary duty, whether by the statute of limitations or otherwise, the Secretary would essentially be given license to evade his duty, thereby effectively repealing it.  When the statute of limitations precludes a citizen suit, it is not just one potential plaintiff losing the

right to sue, but it is the rule of law that suffers.  *Id.*

As the Fifth Circuit has stated, "the preservation of our civil liberties depends upon the faithful and ethical exercise of power by those who bear the mantle of public trust." *Dickson v. Quarterman,* 2006 WL 2457073, 7 (5th Cir. 2006).  If the entire United States government bureaucracy performed its statutory duties as the United States Department of Interior performed, or rather failed to perform, its duties in this case, the Republic could not long endure.  The citizens of the United States, the taxpayers who pay the freight, have the right not only to expect more, but to demand more from their Government.

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS  DIVISION

Harold Schoeffler and Louisiana                        Civil Action No. 05-1573
Crawfish Producers Association-
West

                                             Judge Tucker L. Melançon

versus

                              Magistrate Judge Mildred E. Methvin

Dirk Kempthorne United States
Secretary of the Interior

### JUDGMENT

In accordance with the Memorandum Ruling issued on this date,

IT IS ORDERED that the Plaintiffs' Motion for Summary Judgment [Rec. Doc. 5] is hereby GRANTED and Defendant's Motion to Dismiss/for Summary Judgment [Rec. Doc. 12] is DENIED.

IT IS FURTHER ORDERED that the United States Secretary of the Interior, the Honorable Dirk Kempthorne, the United States Department of Interior and the Federal Wildlife and Fisheries Service are to complete within four (4) months from the date of entry of this Judgment withdrawal of the 1993 proposed rule and/or create a new proposed rule.  The United States Secretary of the Interior, the Honorable Dirk Kempthorne, the United States Department of Interior and the Federal Wildlife and Fisheries Service have an additional eight (8) months from that date to either convert the aged proposal or a new proposed rule into a final critical habitat rule with publication in the Federal Register.

IT IS FURTHER ORDERED that United States Secretary of the Interior, the Honorable

Dirk Kempthorne, the United States Department of Interior and the Federal Wildlife and

Fisheries Service, are to file reports with the Court every sixty (60) days, commencing sixty

(60) days after the date of entry of this Judgment, on the progress being made in implementing

this Judgment.

      Thus done and signed this 25th day of  June,  2007 at Lafayette, Louisiana.